MAX STEIGMAN and JOSEPH GREENE,
Plaintiffs,

*vs.*

HAROLD W. BERRY, A. RONALD BUTTON, MARTIN COMART, ARNOLD GOTTLIEB, BENJAMIN S. HAGGTETT, JR., MAURICE HIRSCH, CARL MADONICK, ROBERT E. MORRIS, ROBERT REALE, FRANK SATENSTEIN, JERRY M. TENNEY, H. ROY PENZELL, SHIRLEY TENNEY, ERIC EMORY, LOUIS MONAS, RANCHO MIRAGE REALTY COMPANY, J. M. TENNEY CORPORATION, TENNEY SECURITIES CORPORATION, GLEN-PAR CORPORATION, GLEN-OPERATING CORPORATION, TENNEY-BROFF CORPORATION, BROADWAY EQUITIES, INC. and TENNEY CORPORATION,
Defendants.

*New Castle, September 18, 1964.*

*William E. Taylor, Jr.*, Wilmington, and *Nemser & Nemser* and *Nemerov & Shapiro,* New York City, for plaintiffs.

*Richard F. Corroon*, of Berl, Potter & Anderson, Wilmington, and *Bodin & Gottlieb*, New York City, for defendant Tenney Corp.

*S. Samuel Arsht*, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants Jerry M. Tenney, Carl Madonick, Robert Reale, Arnold Gottlieb, Martin Comart, Frank Satenstein and Tenney-Broff Corp.

*Clarence W. Taylor*, of Hastings, Taylor & Willard, Wilmington, and *Lewis M. Dabney, Jr.*, New York City, for objecting stockholders Jacobs, Krebs, Zlowe and others.

*Frank J. Miller, Jr.*, Wilmington, and *Herman Odell*, New York City, for objecting stockholders Singer, Dembitzer, Aronstam, Whitman and Ross.

MARVEL, Vice Chancellor: This action was commenced on January 3, 1963 on behalf of the defendant Tenney Corporation by Max Steigman, a Class A stockholder of the corporation purporting to act for all other stockholders of the corporation similarly situated and in the right of their corporation. His complaint alleged that such Class A stockholders had been injured at the hands of the defendant Jerry M. Tenney and the other defendants under his control through the alleged misuse of Mr. Tenney's more than 90% ownership of Class B stock which by charter provision elects two-thirds of the board of Tenney Corporation. After setting forth the capital structure of the Tenney Corporation and its relation to its subsidiaries, the original complaint charged that the defendant Jerry M. Tenny by means of his holdings of Class B stock had directed and managed the affairs of the corporation in a manner designed to enrich himself and his associates at the expense of the Class A stockholders. In other words, the complaint alleged that Mr. Tenney as the holder of 275,000 shares of Class B stock out of 300,000 such shares issued and outstanding (there being 1,704,443 Class A shares also outstanding) had the power to elect two-thirds of the directors of Tenney Corporation. It is then charged that by exercise of such power Mr. Tenney first caused Tenney Corporation to acquire interests in real estate from partnerships and other legal entities in which Mr. Tenney held interests in exchange for Class A shares of Tenney Corporation, thereafter causing such corporation to engage in transactions actually injurious to it, while being simultaneously required to pay excessive compensation to Mr. Tenney and other executive officers and directors. Specific transactions complained of involved dealings with Glen-Par Corporation, Airport Associates, and Rancho Mirage Realty Company.

The complaint also alleged that in the course of these transactions a public market for Class A shares was created in formal compliance with the registration requirements of the Securities and Exchange Act but that the public purchasers of such Class A stock were thereafter victimized by Mr. Tenney through devices such as the diversion to

him of excessive underwriting charges on the part of Tenney Securities Corporation, the imposition of unreasonable service charges for the operation of real estate interests acquired by the corporation as aforesaid, the payment of excessive executive compensation, and the issuance of stock options, all of which devices were allegedly designed to benefit Mr. Tenney and his associates with concomitant injury to the Class A stockholders. Additional complaint was also made of an unfair plan devised and improperly foisted on the Class A stockholders by Mr. Tenney and the director defendants by corporate amendment approved on April 27, 1962 for the alleged purpose of diluting the dividend rights and equity of the Class A holders by making Mr. Tenney's corporate control possible through a holding of a mere 20,000 shares of Class B stock and providing for the exchange of Class B stock for Class A stock at a ratio of 1.82 to 1 instead of on a share for share basis.

On September 27, 1963, the filing of an amended complaint was ordered, there being no objection thereto. One of the purposes for the amendment appears to have been to join one Joseph Greene as a plaintiff, he having allegedly become a Class A stockholder of Tenney Corporation in May 1959 upon his acceptance of an exchange offer made to him as a holder of a limited interest in a partnership acquired by Tenney Corporation.

After reviewing the corporate structure of the Tenney Corporation and it subsidiaries, the amended complaint spells out details of the plan alluded to in the original complaint by means of which Mr. Tenney allegedly promoted partnership ventures in real estate and foisted such properties onto Class A stockholders through devices such as false and misleading prospectuses, a plan allegedly made possible by reason of Mr. Tenney's large holdings of the corporation's Class B stock for which he had paid only $.50 per share. Various allegedly fraudulent transactions were then pleaded in addition to the transactions alluded to in the original complaint, accomplished, according to the amended complaint, through corporate entities owned or leased by Mr. Tenney, his wife and associates, namely Lazro Corporation, Sular Realty Corporation, and Treasure Island Daytona Motel, Inc., Tenney Corporation having been allegedly caused to acquire interests

in unprofitable operations carried on by such entities in exchange for shares of Class A stock.

Charges concerning the making of a personal profit on Mr. Tenney's part in the sale of an interest in land to Airport Associates and a diversion of moneys to an outside interest known as Rancho Mirage Realty Company were expanded, and a separate cause of action based on the Securities Act of 1933 was pleaded. In addition, the details of schemes for funneling secret profits, loans, and excessive service charges into the hands of Mr. Tenney and his associates, the planned concealment of exorbitant executive salaries and bonuses and the use of allegedly false prospectuses to encourage public participation in ventures actually designed to enrich only Mr. Tenney and his friends are set forth in such complaint. By means of the latter the facts on the acquisition of partnership interests, their expected earnings and other relevant information about which potential investors should be informed were allegedly falsified in order to induce the investing public to exchange other securities or to pay cash for Class A stock of Tenney Corporation. A separate claim concerning the abortive purchase by the corporation of a lot on the northwest corner of 38th Street and Second Avenue in Manhattan was pleaded, and the 1962 corporate amendment heretofore complained of, involving the exchange of 1.82 shares of Class A stock for each share of Class B stock, was restated.

On January 14, 1964, a second amended complaint was ordered filed herein pursuant to a stipulation of counsel, under the terms of which plaintiffs agreed to confine their claims to two general categories, namely those of a derivative nature and those concerning the 1962 charter amendment. According to such new complaint, at least one of the plaintiff stockholders had been a Class A stockholder at "* * * all the times of all of the transactions complained of herein * * *", and contained therein was a further elaboration of the methods whereby Tenney and his associates had allegedly enriched themselves at the expense of the Class A holders. Specific real estate ventures which, it was alleged, ultimately resulted in loss and injury to Tenney Corporation and its public stokholders were restated in detail. Also elaborated upon in such amended complaint were allegations concern-

ing the inequities inherent in the 1962 corporate amendment alluded to in the earlier complaints and purportedly approved by the stockholders which provided that Class B stock could be exchanged for Class A stock on the basic of 1.82 shares of Class A stock for each share of Class B stock. Plaintiffs charged in such amended complaint that as a result of failure to disclose the actual workings of the proposed corporate amendment to the Class A stockholders, including the fact that all of the then issued and outstanding Class B stock was owned by Mr. Tenney and his associates, such Class A stockholders had been misled into voting for the amendment with the result that their rights as Class A holders were further injured while the control already in the hands of the Class B holders was made possible by a holding of a mere 20,000 such shares.

The new complaint also made it clear that what is basically complained of by plaintiffs in this suit is the workings of an alleged conspiracy based on a purchase and exchange offer of September 14, 1960, the purpose of which has allegedly been since its inception to foist the equity of unprofitable real estate interests purchased cheaply by promoters onto the Class A stockholders. Thus, while setting forth details as to how an allegedly dishonest syndication process (e. g. a claimed gift to Broadway Equities, Inc. disguised as a consultant charge) was operated in specific transactions, the overall strength of such complaint is found in its analysis of what is charged to have been a plan designed to siphon off the moneys paid in by some 3,000 public stockholders for Class A stock for an equitable interest in real estate, known by those in control to be unprofitable, into the pockets of the latter through bonuses, exorbitant salaries, stock options, loans and other devices calculated improperly to enrich Mr. Tenney and his fellow conspirators. In addition, charges of improperly creating alleged profits by selling real estate and so misleading the Class A stockholders are made. Broad relief in the form of accountings and rescission is prayed for.

On February 26, 1964, plaintiffs moved for leave to settle their claims and to dismiss as provided for in a stipulation of settlement. Notice was sent out to stockholders, a number of objecting stockholders appeared, and this is the opinion of the Court as to the fairness, reason-

ableness and adequacy of the settlement proposed and as to whether or not the action should be dismissed.

The proposed settlement provides roughly as follows: (a) Mr. Tenney and his associates agree to convert their 286,750 shares of Class B stock out of 300,000 issued and outstanding at the earliest date provided for in the 1962 charter amendment, namely May 16, 1966. They also agree to use their best efforts to persuade all other Class B holders to convert in similar fashion and so to eliminate such class of stock: (b) The board of directors of Tenney Corporation agrees to recommend to the stockholders that one class of stock be created through eliminatoin of the Class B stock on the existing conversion ratio of 1.82 to 1, thereby possibly eliminating the need for the conversion outlined in (a). If such reclassification should be effected, Mr. Tenney agrees to surrender to the corporation 30,000 of new common stock: (c) The parties agree that this law suit was the inducing cause of reduction of basic executive salaries in a gross annual amount of $31,500: (d) Mr. Tenney agrees to enter into an employment contract as of November 1, 1963 for a period of three years at an annual salary of $55,000, leaving incentive compensation to the discretion of the board within the limits prescribed in the employment agreement. These are the effective terms of the proposed settlement, other minor parts now being academic. In return for these undertakings on the part of Mr. Tenney and other individual defendants plaintiffs agree to dismiss the complaint with prejudice as to all named defendants other than Rancho Mirage Realty Company and Broadway Equities, Inc. Finally, proponents of the settlement point out management's professed purpose, already accomplished in part, to cut down general and administrative expenses from $1,000,000 to $550,000 per annum. However, no such undertaking is assumed in the stipulation of settlement.

██ A voluntary settlement of contested issued is favored by the law, but courts having taken cognizance of the fiduciary character of a class action of the type here pleaded, settlement of such a case may not be accomplished without the participation in such proceeding of the assigned judge to the extent of determining that the proposed settlement is fair, *Rome v. Archer*, 41 *Del.Ch.* 404, 197 *A.2d* 49. Fur-

thermore, evidence of the diligence of counsel for plaintiff up to the time of settlement in such a case is an important factor in evaluating the fairness of such a settlement, *McDonald v. Gittlin (Del.Ct. of Chancery, Memorandum Opinion, June 8, 1964)*. However, an inadequate tender by those sued in an action such as this should not be availed of merely to put a troublesome suit to rest and to allow management to apply itself to the job of improving a corporation's financial situation.

Conceding that there is no guarantee of success on any of the claims asserted in the complaint; that this case involves sharply contested issues, and that the recovery of corporate moneys allegedly diverted in an improper manner is not a sine qua non to an acceptable settlement, *Nadler v. Bethlehem Steel Corporation*, 38 *Del.Ch.* 427, 154 *A.2d* 146, is the proposed settlement fair, reasonable and adequate in the light of the charges made and the facts before the Court?

█ Its proponents, particularly plaintiffs, believe that the proposed settlement's most important feature is the anticipated elimination of Class B stock, contending that if such is accomplished the corporation will be benefited by the elimination of Mr. Tenney's absolute control. However, unlike the case of *Manacher v. Reynolds*, 39 *Del.Ch.* 401, 165 *A.2d* 741, on which the proponents of the proposed settlement principally rely on this point, and in which the giving up of control was a basic factor in an approved settlement, the complaint here is replete with allegations of fraud accomplished through absolute control. Furthermore, no reimbursement of moneys allegedly diverted from the corporation is proferred. Finally, such reclassification, if accomplished, would leave Mr. Tenney and his associates in possession of approximately 30% of the new common stock. Salary reductions provided for are relatively insignificant in the light of the corporation's overall financial situation, and no offer to return the amounts previously paid to executives in the form of compensation and otherwise is made. Thus, can it be said that the surrender of absolute control by one charged with successfully conspiring to defraud is an adequate basis for settlement on the present record?

█ Consideration must also be given to the question of which of the asserted claims are proposed to be released and which preserved

for other actions of a non-derivative nature. At argument, counsel for Mr. Tenney and his associates indicated that it was intended that claims based on prospectuses and the like are not included in the settlement. However, numerous claims contained in the last complaint are based on the prospectus of September 14, 1960. Again, is the transaction involving Lazro Corporation merely pleaded as a matter of background, as plaintiffs contend, or does the objectant Singer have standing to attack such transaction on the basis of *Maclary v. Pleasant Hills, Inc.,* 35 *Del.Ch.* 39, 109 *A.2d* 830? Next, did Tenney Corporation's sale of its Glen-Par preferred stock and notes bar the action as pleaded or is the claim stated merely considered weak? In this connection was sufficient consideration given to the observation made in *Cohen v. Young (C.A.* 6) 127 *F.2d* 721 that an objecting stockholder is in a different category than a plaintiff required to comply with Rule 23(b)? See Annotation in 69 *A.L.R.2d at* 374. And while the second amended complaint seeks an accounting from Rancho Mirage Realty Company, the settlement agreement excludes such corporation from the stipulation of dismissal. Finally, in view of Tenney Corporations' financial difficulties, which can not be explained away on the basis of the nature of its business, is there any danger that absent complete ratification or release that the dismissal of this suit with prejudice might bar other causes of action by a stockholder or other interested party against promoters based on overvaluation whether or not a full disclosure of the facts was made or is required? See *Old Dominion Copper Mining and Smelting Co. v. Lewisohn,* 210 *U.S.* 206, 28 *S.Ct.* 634, 52 *L.Ed.* 1025, and *Henderson v. Plymouth Oil Co.,* 16 *Del.Ch.* 347, 141 *A.* 197. Compare *Old Dominion Copper Mining & Smelting Co. v. Bigelow,* 203 *Mass.* 159, 89 *N.E.* 193, *McCandless v. Furlaud,* 296 *U.S.* 140, 56 *S.Ct.* 41, 80 *L.Ed.* 121 and *Bovay v. H. M. Byllesby & Co.,* 25 *Del.Ch.* 1, 12 *A.2d* 178. And while releases run, of course, from the corporation to those charged with breaches of fiduciary duty toward it, the doctrine of res adjudicata applies in a derivative suit, *Rome v. Archer,* supra, and *Lifmann v. Aronson (Del.Ch.., August* 28, 1964). A final judgment in such a case puts to rest matters once ligitated even where a second suit is not upon the identical cause of action, it sufficing that a prior judgment has determined issues of fact raised by the pleadings essential to the maintenance of the second action, even though in

form the second action differs from the first, *Worknot v. Millen's Administrator, 2 Harr.* 139, cited in *Epstein v. Chatham Park, Inc., 52 Del.* 56, 153 *A.2d* 180. In short, while a settlement hearing should not be a rehearsal of a trial, here the quantum of what is offered to settle is, in my opinion, insufficient to warrant putting to rest the serious charges herein made in light of the evidence adduced at the settlement hearings.

On notice, an order may be submitted declining to dismiss the suit with prejudice on the basis of the stipulation of settlement.